2007 WY 13

**In the Matter of the Commission on Judicial Conduct and Ethics' Findings and Recommendations with Respect to the Honorable John V. CROW, Circuit Judge, Sublette County, Ninth Judicial District, Pinedale, Wyoming.**

**No. J–06–0001.**

Supreme Court of Wyoming.

Jan. 25, 2007.

**ORDER OF PUBLIC CENSURE**

**This matter** came before the Court upon the "Commission's Findings and Recommendations," filed herein December 4, 2006, by the Commission on Judicial Conduct and Ethics of the State of Wyoming. In its Recommendation, the Commission on Judicial Conduct and Ethics recommends that the Honorable John V. Crow, Circuit Judge (now retired) be publicly censured for his conduct. Pursuant to Rule 24(a) (now 27(a)) of the Rules Governing the Commission on Judicial Conduct and Ethics,

> * * * * *A petition to the Wyoming Supreme Court to modify or reject the recommendation of the commission for censure, removal or retirement, may be filed within 30 days after the filing with the clerk of the Wyoming Supreme Court of a certified copy of the recommendation.* * * * *

This Court notes that Judge Crow has not filed a petition within the time allotted. Pursuant to Rule 24(b) (now 27(b)),

> * * * * *Failure to file a petition within the time provided may be deemed a consent to a determination on the merits

based upon the record filed by the commission.

Because Judge Crow has not filed the petition contemplated by Rule 24(a), this Court finds that he has consented to a determination on the merits based upon the record filed by the commission.

Now, this Court, after a careful review of the "Commission's Findings and Recommendations," the materials attached thereto, and the file, finds that the "Commission's Findings and Recommendations" should be approved, confirmed and adopted by the Court; and that the Honorable John V. Crow, Circuit Judge (now retired) should be publicly censured for the conduct described in the "Commission's Findings and Recommendations." It is, therefore,

**ADJUDGED AND ORDERED** that the Commission on Judicial Conduct and Ethics' "Commission's Findings and Recommendations," a copy of which is attached hereto and incorporated herein, shall be, and the same hereby is, approved, confirmed, and adopted by this Court; and it is further

**ADJUDGED AND ORDERED** that the Honorable John V. Crow, Circuit Judge (now retired) shall receive a public censure for his conduct detailed in the "Commission's Findings and Recommendations;" and it is further

**ORDERED** that the Honorable John V. Crow, Circuit Judge (now retired) shall be, and hereby is, assessed Disciplinary Counsel's costs and fees in the amount of $11,937.17, payable to the Commission on Judicial Conduct and Ethics; and it is further

**ORDERED** that the Clerk of this Court shall docket this Order of Public Censure, along with the incorporated "Commission's Findings and Recommendations," as a matter coming regularly before this Court as a public record; and it is further

**ORDERED** that this Order of Public Censure, along with the incorporated "Commission's Findings and Recommendations," shall be published in the Wyoming Reporter and the Pacific Reporter; and it is further

**ORDERED** that the Clerk of this Court cause a copy of the Order of Public Censure to be served upon the Honorable John V. Crow, Circuit Judge (now retired); and it is further

**ORDERED** that the Clerk of this Court transmit a copy of this Order of Public Censure to members of the Commission on Judicial Conduct and Ethics of the State of Wyoming.

**DATED** this 24th day of January, 2007
**BY THE COURT:**
/s/ Barton R. Voigt
**BARTON R. VOIGT**, Chief Justice

BEFORE THE ADJUDICATORY PANEL OF THE COMMISSION ON JUDICIAL CONDUCT AND ETHICS

STATE OF WYOMING

In the matter of The Honorable John V. Crow

Ninth Judicial Circuit Judge

CJCE 2006–01

COMMISSION'S FINDINGS AND RECOMMENDATIONS

THIS MATTER having come before the Commission on Judicial Conduct and Ethics (the "Commission") for hearing in the above captioned cause on the 10th day of November, 2006, and the Commission having reviewed the Adjudicatory Panel's Findings and Conclusions, having heard oral statements from Judge Crow, Judge Crow's counsel, and Disciplinary Counsel, having duly considered a number of mitigating and aggravating factors with respect to disciplinary action to be recommended in this matter, and being fully informed in the premises, FINDS:

Findings of Fact

1. An Investigatory Panel of the CJCE instituted an initial inquiry regarding Judge Crow's supervision of court personnel, of which Judge Crow received notice in the form of a letter dated January 24, 2006, from Timothy Beppler, Presiding Officer of the Investigatory Panel.

2. The Investigatory Panel determined, based upon its initial inquiry, to proceed with a preliminary investigation pursuant to Rule 10(b)(3) and other applicable provisions of the Rules Governing the Commission on Judicial Conduct and Ethics.

3. Judge Crow received a Notice of Preliminary Investigation, dated March 17, 2006.

4. Judge Crow and his attorney met with Disciplinary Counsel in the course of the preliminary investigation and presented certain additional matters to the Investigatory Panel in the form of a letter from Judge Crow's counsel dated April 27, 2006, including a request for a personal appearance before the Investigatory Panel pursuant to Rule 10(b)(iv)(B).

5. The Investigatory Panel declined Judge Crow's request for a personal appearance before the Investigatory Panel pursuant to Rule 10(b)(5)(B).

6. The Investigatory Panel, having determined that there is reasonable cause to believe judicial misconduct occurred with Judge Crow's supervision of court personnel, referred the matter to an Adjudicatory Panel of the CJCE for the institution of formal proceedings in accordance with Rule 9(b) and Rule 10(b)(7) of the Rules Governing the Commission on Judicial Conduct and Ethics.

7. Pursuant to Rule 14 of the Rules Governing the Commission on Judicial Conduct and Ethics, Judge Crow received a Notice of Formal Proceedings dated May 30, 2006, setting forth the findings of the Investigatory Panel, and advising Judge Crow of the charges to be considered by the Adjudicatory Panel.

8. Judge Crow filed an Answer to said charges.

9. Judge Crow filed his intention to retire with the Wyoming Supreme Court on August 30, 2006.

10. Judge Crow entered into an Agreed Statement of Facts in order to avoid the need for a hearing before the Adjudicatory Panel. Pursuant to said Agreed Statement of Facts, the Adjudicatory Panel considers the following matters as having been presented by competent testimony at a hearing in this matter:

11. This is the second time an Investigatory Panel of the Commission has looked into the workings of Judge Crow's court in Pinedale. On this occasion, as on the previous occasion in 2001, the concerns stem from Judge Crow's alleged failure to exercise appropriate oversight with respect to the workplace conduct of his wife, Jacqueline Ingersoll, who was, until her resignation on February 9, 2006, the chief clerk of Judge Crow's court.

12. Judge Crow was elected and served as Sublette County Attorney from January 1, 1987 until December 31, 1994. In 1989, he hired Jacqueline Ingersoll, previously unknown to him, to be his secretary in the county attorney's office. Ms. Ingersoll became romantically involved with County Attorney Crow.

13. January 1, 1995 was the inaugural date for the Sublette County Court, and John Crow was the county's first county court judge. He immediately decided that Ms. Ingersoll would serve as chief clerk of county court, though her start date in that position was delayed by six months while she finished some projects in the county attorney's office and helped the incoming county attorney, Clark Allen, with the transition into the office. Beginning July 1, 1995, and continuing until her resignation on February 9, 2006, Ms. Ingersoll served as chief clerk of Sublette county (now circuit) court.

14. On May 26, 2001, Judge Crow and Ms. Ingersoll were married in a civil ceremony with the Honorable David B. Park, Seventh Judicial District Court Judge, presiding.

15. BJPA's 2001 complaint. Shortly after the Crow/Ingersoll marriage, there transpired a series of events that culminated in an ethical complaint being made against Judge Crow by the Board of Judicial Policy & Administration ("BJPA"), of which then Chief Justice Larry Lehman was chairman. On November 27, 2001, the BJPA submitted a verified complaint to the Commission, signed by then Chief Justice Lehman, detailing the allegations against Judge Crow.

16. The verified complaint included a supporting affidavit from Holly Hansen, Court Administrator, Wyoming Supreme Court, which detailed Ms. Ingersoll's interpersonal conflict with a former deputy clerk during 2000, as well as a complaint about Ms. Ingersoll received from a member of the public on August 31, 2001. The verified complaint

made reference to Judge Crow's marriage to Ms. Ingersoll and alleged that Judge Crow had violated the following ethical canons:

Canon 1 of the Wyoming Code of Judicial Conduct, which provides, "An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Code are to be construed and applied to further that objective."

Canon 2A, which provides, "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." The commentary to Canon 2A provides, "Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on the judge's conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly. The prohibition against behaving with impropriety or the appearance of impropriety applies to both the professional and personal conduct of a judge. Because it is not practicable to list all prohibited acts, the proscription is necessarily cast in general terms that extend to conduct by judges that is harmful although not specifically mentioned in the Code. Actual improprieties under this standard include violations of law, court rules or other specific provisions of this Code. The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired.

Canon 2B, which provides, "A judge shall not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment."

Cannon 3C(4), which provides in relevant part, "A judge shall avoid nepotism and favoritism."

17. The verified complaint summarized the BJPA's concerns as follows:

The Board of Judicial Policy and Administration is not the aggrieved party in this situation. The Board has determined, however, that it has a duty to bring the matter to the attention of the Commission on Judicial Conduct and Ethics. In taking this action, the Board represents the individuals who are most affected by the marriage at issue in this Verified Complaint; the employees of the Circuit Court and the litigants who appear in the Circuit Court. Neither the employees nor the litigants can challenge the propriety of this arrangement without fear of retribution.

18. The BJPA's 2001 complaint was resolved by a "Private Censure and Corrective Notice" dated May 31, 2002, by which Judge Crow agreed, in pertinent part:

- The Wyoming Code of Judicial Conduct imposes certain duties upon judges with respect to supervision of court personnel. Canon 3B(4) states:

  A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity, *and shall require similar conduct of lawyers, and of staff, court officials and others subject to the judge's direction and control.* [Italics supplied].

- Judge Crow breached the above-referenced duty in that he did not discipline Ms. Ingersoll when she treated coworkers, other agency personnel and members of the public in an impatient, undignified and discourteous manner.

- Judge Crow's conduct in failing to appropriately supervise Ms. Ingersoll demeaned the judicial office in that it created the appearance of impropriety. Judge Crow agreed to accept a private censure for his breach of Canon 3B(4).

- Judge Crow agreed to implement the following corrective measures:

a. Judge Crow would educate each and every employee of the Ninth Judicial Circuit Court regarding the duty to be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom court personnel deal in an official capacity. Judge Crow would advise each and every employee that any complaints or concerns regarding working conditions or mistreatment by coworkers shall be directed to Holly A. Hansen, Court Administrator, Wyoming Supreme Court. Judge Crow would document compliance with this remedial measure by requiring each employee to sign a form acknowledging their duty to conduct themselves in a patient, dignified and courteous manner.

b. For a period of six months from the date of the order, Judge Crow would cause all persons coming before his court to be provided with the survey form and a pre-posted envelope addressed to Holly A. Hansen, Court Administrator, Wyoming Supreme Court. The survey form invited feedback in the areas of quality of service, friendliness and courteousness of court personnel.

• Judge Crow was given a private censure for his conduct and was required to fully comply with the corrective measures set forth above. The private censure would become part of the permanent record and could be considered in any future proceedings.

• Judge Crow stipulated that the private censure and corrective notice and the findings on which it was based were properly presented, considered and imposed under Rule 13 of Part II of the Rules for the Commission.

• Judge Crow agreed that a copy of the private censure and corrective notice could be provided to the BJPA.

19. Judge Crow fully complied with the requirements of the Private Censure and Corrective Notice. All employees were required to read and sign a form acknowledging their duty to conduct themselves in a patient, dignified and courteous manner prior to going to work for the circuit court. The required survey forms were duly provided, and many were received by the Wyoming Supreme Court Administrator during 2002 and 2003. As discussed in more detail below, ninety percent of the survey forms rated the Sublette County Circuit Court Clerk's office favorably with respect to overall service, friendliness and efficiency. Judge Crow at no time received copies of the survey forms or any communication from the Wyoming Supreme Court Administrator regarding the survey forms.

20. The 2006 Complaint. On February 8, 2006, then Wyoming Supreme Court Chief Justice William U. Hill faxed the following letter to Judge Crow:

Dear Judge Crow:

The Court has been informed that one of your clerks, Julie Helzer, submitted her letter of resignation last Monday. Inasmuch as this is the third clerk to resign from your court within five months, the Court is concerned about the management and administration of the court.

At our direction, the Court Administrator and Court Services Officer have conducted exit interviews with the three clerks who have left your court. The feedback is consistent and extremely disturbing. Consequently, my colleagues and I must now decide how next to proceed. In the meantime, your court is not authorized to refill the vacancy created by Ms. Helzer's departure.

Please have your staff fax a copy of Ms Helzer's letter of resignation to the Court Administrator (Fax # 307–777–3447) this afternoon.

Thank you.

Very truly yours,

William U. Hill
Chief Justice

21. On February 9, 2006, Jacqueline Ingersoll resigned as Judge Crow's chief clerk.

22. During 2006, Commission member Dan Zivkovich was contacted by a former deputy clerk of the Sublette County Circuit Court, who reported conduct by Ms. Ingersoll similar to that found in the 2001 investigation. Following an initial investigation by

Disciplinary Counsel, notice of a preliminary investigation pursuant to Rule 10(b)(3) of the Rules Governing the Commission on Judicial Conduct and Ethics was filed March 17, 2006. Disciplinary Counsel's investigation revealed the following:

23. In the present proceeding, as in the 2001 proceeding, all witnesses interviewed agreed that Judge Crow is an exemplary judge-conscientious, polite and hard working. The Notice of Formal Proceedings in this matter contains no allegations of corruption of office, intemperance, or anything involving moral turpitude on Judge Crow's part. He has been a respected member of the bar and judiciary for many years.

24. Holly Hansen is the Court Administrator for the Wyoming Supreme Court and the Executive Secretary for the BJPA. Circuit court personnel throughout the state fall within her jurisdiction. Ms. Hansen provided approximately eighty survey forms which were received by her office during 2002 and 2003 as a result of the 2002 Private Censure and Corrective Notice. Ninety percent of these rated the Sublette County Circuit Court Clerk's office favorably with respect to overall service, friendliness and efficiency. A handful of these surveys contained negative comments, including:

- "Two are very rude ... You are so glad to get out of there in one piece, you forget about the kind of service you get! ... No doubt they know what they're doing—they just don't care to help you—chief clerk is impossible to get a hold of, because she is never there. When she is, she is nasty—nasty—nasty."
- "If Jackie Ingersoll Crow (Judge Crow's wife) is working the experience/service is not very pleasant. She is very unprofessional and mean at times! ... [Jackie] treats you very poorly and unprofessional—the others are great."
- "On August 1, 2002, I had occasion to be in the office of the circuit court. The person who helped me at the counter was pleasant and helpful. I don't know her name. There seemed to be a lot of people going into the court room. I went in to see what was going on. I was totally surprised at what I witnessed. Court was going on, and here is a black dog in the court room. And I believe it belonged to the judge. And it went around everywhere. Then the telephone kept ringing and ringing in there. The judge was trying to do his work, and the telephone kept ringing. There was a lady up in front with him, and all she did was sit there with her arms folded across her chest, looking at the judge. It was funny to see. I think the dog and the telephone were all people saw and heard. I don't know why the lady was up in front with the judge. She didn't do anything except look at the judge in a bad way. She looked mean. She wouldn't even answer the telephone. It rang a lot. I wouldn't even be writing this, except that a few weeks later I had to come back to the office again. The lady that was just sitting in court looking at the judge was yelling at the nice lady that had helped me the first time. I don't know what the nice lady had done, but the other lady was really letting her have it, if you know what I mean. There were two other people there when I was there, one of them was a police officer. I don't know their names, but we all looked at each other like, I'm glad that's not me.' Anyway, between the dog and the telephone and that one lady, I am very glad I don't have to spend any time in court. I would either have to laugh or cry. I didn't think it was like that. Now I know."
- "This is my second time in this office, so I will rate on both visits. First visit, there was not any negativity towards me, but witnessed one employee being screamed at in front of other public patrons along with myself ... First visit, I called in to ask questions, referred to the clerk of court, and she acted like I was putting her out by being on the phone. Second visit, I filed some papers with someone and she sighed out loud, again I was apparently taking up someone's time ... I felt so ashamed to be witnessing the anger that was put upon

the employee ... Who oversees this office? Do they have a clue as to how the general public and the employees are being treated?"

- "After numerous telephone calls to Ms. Ingersoll, I learned that she only works between the hours of 9 a.m. and 4 p.m., with an hour for lunch and LOTS of smoke breaks. I greatly resent my tax dollars paying a public servant who is (a) never there, and (b) treated me like I was a 'dog deposit' on her doorstep."

25. Ms. Hansen reports that she has received numerous complaints regarding two of the clerks, Jacqueline Ingersoll and Tracy Dykstra, with respect to their treatment of coworkers and members of the public. Three deputy clerks had recently resigned, all as a result of an abusive work environment: Betty Golden, who worked in the office as a deputy clerk from 2000 until 2005; Sandy Meeks, who lasted just two days during 2005; and Julie Helzer, an experienced deputy who worked for the Laramie County Circuit Court for many years before moving to Pinedale in late 2005.

26. During 2006, Ms. Hansen's office received several complaints regarding the Sublette County circuit court clerk's office. Sandy Meeks, the short-lived deputy clerk, reported "the atmosphere was so tense and stressful that she knew she could not continue employment with the office." Ms. Meeks was treated rudely by Tracy Dykstra and observed a "definite conflict" between Jacqueline Ingersoll and Ms. Dykstra. Ms. Meeks stated she "can take a lot of stress, but the office environment in the Sublette Circuit Court was beyond any stress she has ever known."

27. Ms. Hansen also received a phone call from a member of the public whose contact with Ms. Ingersoll left her in tears. The lady reported, "Even though she's Judge Crow's wife, she shouldn't treat people that way. She's not meeting human standards."

28. Ms. Hansen also received a memo from Donna Yeager, who was employed for many years as chief deputy in the Sweetwater County/Circuit court, and recently took a position as secretary to Ralph Boynton, Sublette County attorney. The county attorney's office is directly across the hall from the circuit court clerk. After just two weeks on the job, Ms. Yeager was so disturbed by what she observed that she wrote:

I feel badly for myself and all of my former Clerks of Court who worked endlessly to make our Courts as pleasant a place as we possibly could for friend and foe alike! I would have probably crawled under something if townspeople had spoken so ill of me during my years as a Clerk as this place does of Jacque. Both she and Tracy have spoken rudely to me in the two weeks I've been working here. A lady came into our office two days ago so mad she was crying and so embarrassed she was swearing because of her treatment at the counter at Circuit Court ... I don't gripe much, but this is ridiculous.

29. Following the institution of the present investigation and Julie Helzer's resignation on February 6, 2006, Jacqueline Ingersoll submitted her resignation on February 9, 2006.

30. Marilyn Jensen is the Clerk of District Court in Pinedale and has served in that elected position since 1989. Ms. Jensen reports that although Jacqueline Ingersoll has always been poor in dealing with people, in the months before her resignation she had gotten worse. Courthouse personnel often joked about "Judge Jackie" because of her abrasive, domineering personality. For a time the county attorney's office, which is directly across the hall from the office of the circuit court clerk, would bring their circuit court filings to Ms. Jensen—whose office is in a separate building from the one that houses the county attorney and the circuit court—and ask Ms. Jensen's office to take them to the circuit court clerk's office for filing. The employees in the county attorney's office simply did not want to deal with Ms. Ingersoll and Ms. Dykstra. Ms. Jensen spoke with Judge Crow about the situation and told him his clerks were too hard to deal with.

31. Similarly, the sheriff's office began avoiding the circuit court clerk's office. For many years, the only postage machine in the courthouse was located in the district court

clerk's office. The sheriff's office performed the chore of picking up mail from the various offices and bringing it to the district court clerk's office for posting. After too many run-ins with the circuit court clerk's office, the sheriff's office declined to perform this function for that office. In response, the circuit court acquired its own postage machine. Now, Ms. Jensen reports, all correspondence from the circuit court is received by mail, even though the circuit court is just around the corner from the district court. Ms. Jensen considers this a terrible waste and more evidence of the circuit court clerk's inability or unwillingness to get along with other agencies.

32. Ms. Jensen reports that people who come into her office by mistake and are then directed to circuit court will sometimes say, "Please don't send me over there." Ms. Ingersoll's office has been known to refuse to file things submitted after some arbitrary deadline, say 4:00 p.m. Ms. Jensen has found herself serving as a mediator between the circuit court and other agencies-a task she does not relish.

33. Betty Golden was employed as a deputy circuit court clerk from August 2000 until August 2005. She resigned her position when the stress of the job made her dread going to work every day. Ms. Golden reports that it was impossible to please Ms. Ingersoll, and that Ms. Dykstra was impossible to get along with, and had a very bad temper. Ms. Golden tried to talk with Judge Crow about the problems she was having with Ms. Ingersoll and Ms. Dykstra, including the humiliating treatment she was enduring. Judge Crow did not want to get involved; he told Ms. Golden she would have to work it out with Ms. Ingersoll.

34. Ms. Golden reports that Ms. Ingersoll has held a part-time job at the local swimming pool for many years, as a result of which she typically arrives at work after 9:30 a.m.

35. Ralph Boynton has served as the Sublette County attorney since September 2005. He has a record of thirty years' experience in many courts around the state, having served as a prosecutor in Natrona, Campbell and Park Counties, as a municipal judge in Casper, and as a public defender in many Wyoming courts. Mr. Boynton has a very high regard for Judge Crow, whom he describes as "kind, gracious and erudite."

36. Judge Crow openly refers to his wife as "she who is to be feared." Mr. Boynton witnessed bickering between Judge Crow and Ms. Ingersoll in open court, and was embarrassed by their conduct. He witnessed tantrums and tirades by Ms. Ingersoll and describes both Ms. Ingersoll and Ms. Dykstra as rude and unprofessional in their dealings with litigants, other agency personnel, and each other. He heard Ms. Ingersoll criticize Judge Crow in the presence of members of the public. Mr. Boynton's office receives frequent complaints from people who have been treated rudely by Ms. Ingersoll and Ms. Dykstra. Mr. Boynton's staff often asked him to take papers to the circuit court clerk's office because they did not want to deal with Ms. Ingersoll or Ms. Dykstra.

37. Mr. Boynton reports that during the two months she was employed as a deputy clerk, Julie Helzer was a "breath of fresh air" in the office. Unlike Ms. Ingersoll and Ms. Dykstra, Ms. Helzer was courteous and helpful toward litigants and other agencies. Mr. Boynton was very sorry when she quit over the abusive treatment she received from Ms. Ingersoll and Ms. Dykstra.

38. Julie Helzer was employed as a deputy clerk from November 15, 2005 until February 6, 2006, when she submitted her letter of resignation. She came to the Sublette County circuit court from Cheyenne, where she had fourteen years of experience as a deputy clerk in the Laramie County circuit court. She has the utmost respect for Judge Crow, but quit because she was becoming physically ill from the stress of dealing with Ms. Ingersoll and Ms. Dykstra. She never went to Judge Crow with complaints about Ms. Ingersoll because she believed that because he was married to Ms. Ingersoll, nothing would be done. She once observed Ms. Ingersoll complain to Judge Crow about something Ms. Dykstra had done. Judge Crow told her to "deal with it." Ms. Helzer witnessed Ms. Ingersoll being extremely disrespectful toward Judge Crow.

39. In her resignation letter, Ms. Helzer stated, "I cannot tolerate the rude, angry and abusive treatment dealt to the public, other agencies the Court has contact with on a daily basis and myself, as well … I don't think I have ever felt more worthless, humiliated and downright stupid in all my life."

40. In her February 9, 2006 resignation letter, Ms. Ingersoll was referring to Ms. Helzer when she wrote:

I have better things to do with my time than to hang around here and put up with more accusations from disgruntled employees. If a 15 year veteran clerk, who knew absolutely nothing about criminal work or handling money, sniffles and quits after 43 days of work because I finally expected her to start carrying her fair share of the case load in this office (and do it right I might add), then good riddance! She never would have been the clerk this office needs.

41. Ms. Helzer confirms that Ms. Ingersoll had a side job at the local swimming pool, and that her work day typically began at 9:30 a.m. or later.

42. Since her 2001 termination by Ms. Ingersoll, Rebecca Manning has been employed as the secretary to the Sublette County Attorney. Ms. Manning reports that following the resolution of the 2001 CJCE investigation, "things got better for awhile" with respect to Ms. Ingersoll's conduct, but Ms. Ingersoll "eventually slipped back into her old ways." The county attorney's office where Ms. Manning works is directly across the hall from the circuit court clerk's office. Ms. Manning reports that up until Ms. Ingersoll's resignation in February of 2006, people would frequently come into the county attorney's office to complain about the rude treatment they received in the circuit court clerk's office. Ms. Manning reports that some of these people were reduced to tears. Ms. Manning witnessed Ms. Ingersoll snickering and rolling her eyes at witnesses in court, with Judge Crow presiding. Ms. Ingersoll and Tracy Dykstra,[1] her deputy clerk, were rude to everyone and made de-

rogatory comments about courthouse personnel. Ms. Manning continues to describe Judge Crow as a "good guy and a good judge," but insists that Ms. Ingersoll "ruled the roost" in and out of the courtroom. Ms. Manning confirms that Ms. Ingersoll typically arrived at work after 9:00 each morning.

43. According to Ms. Manning, things are much better now, after the resignations of Ms. Ingersoll and Ms. Dykstra. Ms. Manning reports that the new court personnel are great to work with and gives the credit for this change to Diana Wilsey–Geer, the acting clerk of circuit court.

44. Donna Yeager is the administrative secretary to Ralph Boynton, Sublette County Attorney. She has held this position since September of 2005. She worked for many years in the Sweetwater County circuit court, and even filled in for Ms. Ingersoll as clerk of Judge Crow's court a few years ago when Ms. Ingersoll was undergoing treatment for cancer. She describes Judge Crow as a "wonderful guy," and she had fun working for him. Ms. Yeager considered Ms. Ingersoll "sort of a friend" before she went to work in the county attorney's office. She was surprised at the rude treatment she soon observed, and was subjected to, by Ms. Ingersoll. Ms. Yeager described Ms. Ingersoll as "rude to everyone," and "always jumping down peoples' throats." Ms. Yeager was offended enough by what she observed to write a letter to Holly Hanson [sic] in September of 2005, a few weeks after she began working in the county attorney's office. She confirms Ms. Manning's report of people coming into the county attorney's office with complaints about their treatment in the circuit court clerk's office and says these complaints sometimes occurred on a weekly basis. Ms. Yeager says things are much better since the resignations of Ms. Ingersoll and Ms. Dykstra, describing the change as "like night and day."

45. It appears that Jacqueline Ingersoll's part-time employment at the local swimming pool was disruptive to her work schedule.

1. Following Ms. Ingersoll's February 2006 resignation, Ms. Dykstra submitted her resignation later that month.

She typically arrived at 9:30 a.m. or later in an office that is open from eight to five. It appears that Ms. Ingersoll's part-time employment inappropriately interfered with her working hours as chief clerk of court.

46. This Panel was convened to inquire into whether Judge Crow breached the Wyoming Code of Judicial Conduct in his conduct, above enumerated, regarding supervision of his staff. More specifically, the purpose of the inquiry was to determine:

a. Whether Judge Crow has complied with the requirements of the Wyoming Code of Judicial Conduct, which imposes certain duties upon judges with respect to supervision of court personnel. Canon 3B(4) states:

A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity, *and shall require similar conduct of lawyers, and of staff, court officials and others subject to the judge' s direction and control.* [Italics supplied].

b. Whether Judge Crow complied with the requirement of Canon 3C(4) that "a judge shall avoid nepotism and favoritism." Personnel policies applicable to the clerk of court position provide, "Each full-time employee's position with the Circuit Court must be the employee's primary employment. Outside employment is permissible only if it can be accomplished outside normal working hours ... and has been approved in writing by the supervisor." It appears that Ms. Ingersoll may have had part-time employment which inappropriately interfered with her working hours as chief clerk of court.

c. Whether Judge Crow, in the performance of his supervisory duties, met the requirements of Canon 1 that a judge "should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved."

d. Whether Judge Crow, in the performance of his supervisory duties, met the requirements of Canon 2A that a judge "shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

47. By his signature on the Agreed Statement of Facts, and by the signature of his counsel, Judge Crow agreed that said Agreed Statement of Facts may be accepted by the Panel as the record to be considered in making a determination in this matter. Judge Crow thereby waived the hearing available to him pursuant to the Rules Governing the Commission on Judicial Conduct and Ethics.

48. At a conference call held October 9, 2006, the Adjudicatory Panel concluded: (1) by his conduct, Judge Crow breached the requirements of Canons 3B(4) and 3C(4), Wyoming Code of Judicial Conduct; and (2) the matter should be submitted to the Commission for consideration of appropriate sanctions. The Adjudicatory Panel's written findings and conclusions, dated October 18, 2006, were served upon Judge Crow's counsel.

49. By a written request dated November 1, 2006, Judge Crow requested to appear in person and with his counsel at the Commission hearing that was to be held November 10, 2006, the purpose of which was to consider and recommend appropriate disciplinary action with respect to Judge Crow's misconduct. Both Judge Crow and his counsel appeared at said hearing and made oral statements on Judge Crow's behalf.

50. No costs of service of process, witness fees and mileage, or deposition costs have been incurred in this case. Fees and costs of Disciplinary Counsel have been incurred in the amount of $11,937.17.

*Conclusions of Law*

■ 51. The Commission concurs with the Adjudicatory Panel's conclusion that by his conduct, Judge Crow breached the requirements of Canons 3B(4) and 3C(4), Wyoming Code of Judicial Conduct.

■ 52. The Commission finds that the following mitigating factors should be considered with respect to appropriate disciplinary action in this case:

a. There is no evidence or suggestion that Judge Crow, personally, ever conducted himself in a less than professional manner during his judicial tenure.

b. There is no evidence that Judge Crow, personally, acted dishonestly or in a manner that would tend to bring his office into disrepute.

53. The Commission finds that the following aggravating factors should be considered with respect to appropriate disciplinary action in this case:

a. Judge Crow exhibited a persistent course of failing or refusing to appropriately supervise and discipline members of his court staff, including most notably his wife.

b. Judge Crow's misconduct in this regard extended over a number of years, and impacted a large number of members of the public, co-workers and other agency personnel within the courthouse.

c. Judge Crow's misconduct in this regard continued even after he was advised, in the form of the 2002 private censure, that such lack of supervision was unacceptable and not in keeping with his ethical obligations.

d. Because Judge Crow's lack of supervision and failure to discipline his staff extended mainly to his wife, the appearance of impropriety and the disrespect brought upon his office was heightened.

e. Because Judge Crow elected to continue an employment relationship with his wife, even after the 2002 private censure, it was especially incumbent that he provide supervision and discipline in a manner and to an extent that would place his office beyond reproach. In this responsibility he failed miserably.

### Commission's Recommendations

After deliberation, the Commission recommends the following disciplinary action:

1. That Judge Crow receive a public censure for the misconduct detailed above.

2. That Judge Crow be assessed Disciplinary Counsel's costs and fees in the amount of $11,937.17.

### Certification

By his signature below, the Chair of the Commission on Judicial Conduct and Ethics hereby certifies that the foregoing constitutes the Commission's findings and recommendations as determined upon a vote of more than 65% of the entire Commission, which findings and recommendations are submitted to the Wyoming Supreme Court pursuant to Part II, Rule 23 (effective June 29, 2000) of the Rules Governing the Commission of Judicial Conduct and Ethics and in accordance with Rule 26 of these rules effective November 15, 2006.

Dated this 4th day of December, 2006.

/s/ David Koerwitz
David Koerwitz, Chair
Commission on Judicial Conduct and Ethics